IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JOSE A. CABRERAS-CAÑUELAS [1]**,<br>**JEAN CARLOS BENITEZ-MELENDEZ [2]**,<br><br>Defendants. | Criminal No. 15-665 (PAD/BJM) |

### REPORT AND RECOMMENDATION

Subsequent to a shooting outside the federal building and courthouse in Hato Rey, Jose A. Carlos Cabreras-Cañuelas ("Cabreras") and Jean Carlos Benitez-Melendez ("Benitez") were subjected to a stop and frisk near the scene of the shooting after agents observed Benitez exhibiting unusual conduct and covertly exchanging an object with Cabreras. The frisk of Cabreras led to the discovery of a firearm in his waistband. Benitez and Cabreras were each indicted with one count of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm), and Benitez was further charged with one count of 18 U.S.C. § 922(g)(3) (unlawful user of a controlled substance in possession of a firearm). Docket No. 10. Cabreras and Benitez moved to suppress their post-arrest statements, [1] the firearm, and the ammunition, Docket Nos. 24–25, and the government opposed. Docket No. 30. This matter was referred to me for a report and recommendation, Docket No. 28, and an evidentiary hearing was held on September 26, 2016. Docket No. 53.

For the reasons set forth below, the motions to suppress should be **DENIED**.

### BACKGROUND

At the hearing, the court heard testimony from Julio Torres ("Torres"), a special agent with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") who has nine years of experience and is a group supervisor of other ATF agents. He testified that at around 5:30

---

[1] The government represented at the suppression hearing that it will not seek to introduce Cabreras's statements in this case, and so only Benitez's post-arrest statements remain at issue.

p.m. on October 20, 2015, he and other agents were informed about a shooting that had just occurred in front of the federal building and courthouse in Hato Rey. Torres immediately sent agents to the crime scene, which was at the intersection of Carlos F. Chardon Street and Avenue Arterial Hostos, and joined them shortly after. Gov't Ex. 1. Torres wore a jacket identifying him as an ATF agent.

When Torres arrived to the crime scene, law enforcement agents were starting to mark the perimeter of the scene with crime-scene tape. Gov't Exs. 1-A, 1-B. Within that perimeter, Torres saw bullet casings, a vehicle with bullet holes, and blood on the ground. Gov't Ex. 1-B. At that time, Torres also learned that a person who was visiting the U.S. Probation Office had been shot and carried away by an ambulance. Torres was not told that an "active shooter" remained near the crime scene, and other agents began looking in nearby locations for evidence that could aid the investigation. Soon thereafter, Torres was approached by an unknown individual outside the bounds of the crime-scene-marked perimeter. Next to Torres was ATF Agent Roberto Santiago ("Santiago"), who also wore an ATF-labeled jacket, and two other law enforcement officers.

When the unknown individual, who was later identified as Benitez, approached the agents, Benitez was "agitated," waving his hands in the air, "yelling," and asking whether the person who had been shot was his brother.[2] Torres immediately asked Benitez for identification to make sure that the individual was the victim's brother rather than someone involved in the crime. Santiago also asked for identification. Benitez did not produce an identification; instead, he turned around and started walking away from the agents.

Torres yelled "Police" in Spanish and ordered Benitez to stop, as he did not know whether Benitez was in fact the victim's brother or some other person who committed the crime. Torres explained that, based on his training and experience, individuals who commit

---

[2] Torres acknowledged his report of investigation did not state that the individual was yelling, agitated, or waving his hands in the air. But Torres asserted that the report is meant to provide a "synopsis" of the incident rather than to document "each and every detail" relating to the incident.

this type of crime return to the crime scene in order to get information about the victim. And Torres found it "unusual" that an individual who claimed to be the victim's brother would walk away rather than seek to help law enforcement capture his kin's aggressor.

As Benitez walked away, Torres asked Santiago to accompany him as they followed Benitez. As the agents trailed, Torres did not observe a bulge protruding from Benitez's clothing or a weapon in his hand. But Torres nonetheless drew his ankle-holstered firearm and hid it behind his back on account of Benitez's unusual behavior. Benitez then met another individual, later identified as Cabreras, and made a "quick" movement with his hands as he reached for his waistband and gave an object to Cabreras.[3] When the exchange was made, Cabreras and Benitez were within a very close distance—in Torres's words, the two were "face to face."

Torres did not see the object being exchanged. But he believed, based on the "movement of the hands" and the close proximity of the two individuals, that the object was a firearm. After seeing the exchange, and fearing for the safety of himself and other agents, Torres drew his weapon from behind his back, leveled it at the two individuals, and yelled "Police! Put your hands up!" Torres asked Santiago to pat-down Benitez as he patted down Cabreras. During the pat-down, Torres felt something that felt like a firearm in Cabreras's waistband and immediately retrieved the object, which indeed was a firearm. Both Cabreras and Benitez were arrested at that time.

## DISCUSSION

Cabreras and Benitez contend that the ATF agents lacked reasonable suspicion to conduct the stop and frisk, and Benitez contends that his post-arrest statements must be suppressed because his arrest was unlawful.[4] The government maintains that Benitez lacks standing to seek suppression of the physical evidence, that the circumstances known to the

---

[3] Cabreras submitted a declaration in which he claims that *he* gave an object to Benitez rather than the other way around, and that the object was a cellphone. Docket No. 24-1 ¶¶ 3–6.

[4] Neither Benitez nor Cabreras contend that their post-arrest statements were obtained in violation of the Fifth Amendment.

agents at the time imparted ample support to conduct the stop and the frisk for weapons, and that both individuals were lawfully arrested.

I.     **Fourth Amendment Standing**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Fourth Amendment rights are personal, and as such, a person may not vicariously assert the rights of others. *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). A person may challenge the lawfulness of his or her arrest under the Fourth Amendment, and may seek suppression of statements made after an unlawful arrest. *See, e.g.*, *United States v. Downing*, 665 F.2d 404, 408 (1st Cir. 1981) (citing *Wong Sun v. United States*, 371 U.S. 471, 475 (1963)). On the other hand, a "person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* Likewise, a person "who was not himself subjected to a pat down search d[oes] not have standing to raise a Fourth Amendment claim on the basis of [that] search." *Estrada v. Rhode Island*, 594 F.3d 56, 66 n.18 (1st Cir. 2010) (citing *United States v. Sowers*, 136 F.3d 24, 28–29 (1st Cir. 1998)).

In this case, it is uncontested that Benitez may seek to suppress his post-arrest statements in the event his arrest is found to be in violation of the Fourth Amendment. *See, e.g.*, *Wong Sun*, 371 U.S. at 475. However, the government contends that Benitez lacks standing to seek suppression of the firearm and ammunition. Torres testified that the firearm was found in Cabreras's waistband during the pat-down search. And Benitez acknowledges that the firearm's magazine, which contained the ammunition, was also retrieved from Cabreras's person. Docket No. 24 at 3; Docket No. 25 at 1. Accordingly, all the physical evidence sought to be suppressed was uncovered as a result of the pat-down search of Cabreras's person—not Benitez's. As in *Estrada* and *Sowers*, while Cabreras had a reasonable expectation of privacy in the items he carried on his person, Benitez lacks

standing to seek suppression of the firearm and ammunition. *See Estrada*, 594 F.3d at 66 n.18; *Sowers*, 136 F.3d at 28–29. Thus, Benitez may seek to suppress his post-arrest statements, but only Cabreras may seek suppression of the physical evidence.

**II.    Stop & Frisk**

Under the Fourth Amendment, a stop and frisk by a law enforcement officer must satisfy the reasonable suspicion standard. *United States v. Woodrum*, 202 F.3d 1, 6 (1st Cir. 2000). A stop and frisk "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly." *Illinois v. Wardlow*, 528 U.S. 119, 127 (2000). So to justify the intrusion and meet the reasonable suspicion standard, the government must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). These facts must be derived from "what the officer knows (or has reason to believe) and how events unfold." *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004).

"Reasonable suspicion 'is considerably less than proof of wrongdoing by a preponderance of the evidence . . . [or] probable cause.'" *United States v. Dapolito*, 713 F.3d 141, 159 (1st Cir. 2013) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). But while "the showing required to meet this standard is considerably less demanding than that required to make out probable cause, the officer nonetheless must possess (and be able to articulate) more than a hunch, an intuition, or a desultory inkling of possible criminal activity." *Romain*, 393 F.3d at 71. At its core, the "'touchstone' of this inquiry is the reasonableness of the officer's actions." *United States v. Cardona-Vicente*, 817 F.3d 823, 827 (1st Cir. 2016). That assessment calls for "a fact-sensitive task, bound up in the warp and woof of the surrounding circumstances." *United States v. Chhien*, 266 F.3d 1, 8 (1st Cir. 2001).

And where, as here, the officer conducts a frisk after the stop, "it is insufficient that the stop itself is valid" when seeking to justify the frisk. *United States v. McKoy*, 428 F.3d

38, 39 (1st Cir. 2005). Rather, "there must be a separate analysis of whether the standard for pat-frisks has been met." *Id.* But in some cases, the same circumstances known to the officers are sufficient to satisfy both the stop *and* the frisk, because "when an officer has a reasonable suspicion that a crime of violence has occurred, 'the same information that will support an investigatory stop will *without more* support a frisk.'" *United States v. Mouscardy*, 722 F.3d 68, 75 (1st Cir. 2013) (quoting *United States v. Scott*, 270 F.3d 30, 41 (1st Cir. 2001) (emphasis added)).

In this case, the ATF agents had reasonable suspicion to stop Cabreras and Benitez, and frisk them for weapons. The timing of the stop is "of decretory significance because" it limits the evidence the court may consider when determining the lawfulness of the stop and frisk. *See United States v. Espinoza*, 490 F.3d 41, 49 (1st Cir. 2007). Benitez did not yield to the ATF agents' commands to stop as he walked away from them, and so defendants cannot reasonably argue that a seizure occurred at that time. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991). Only after Benitez made the covert exchange with Cabreras, who previously had not been in contact with the agents, did Torres level his weapon at both individuals—causing them both to freeze. *See, e.g.*, *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) ("an individual must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment"). It was at this moment that Cabreras and Benitez were subjected to the stop, as well as the frisk, and so only those circumstances that preceded this juncture may be factored into the reasonable suspicion calculus.

Prior to Cabreras's secret exchange with Benitez, the agents observed Benitez exhibiting certain unusual conduct which raised their suspicions that criminal activity could be afoot. First, Torres relayed that Benitez approached the ATF agents near the scene of the crime shortly after the shooting had occurred, and that the agents did not know Benitez's identity when he first approached them. A reasonable officer could certainly factor Benitez's temporal and geographic proximity to the scene of a serious, violent crime when calculating whether he was a suspicious person. *See United States v. Goodrich*, 450 F.3d

552, 562 (3d Cir. 2006) (individual's temporal and geographic proximity to the scene of a recently perpetrated offense is relevant to *Terry* analysis); *United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (person's car was found parked in lot where late night shots had been fired, and that location was relevant under *Terry*); *United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003) (that person was found eight blocks away from crime scene was a relevant factor); *United States v. Brown*, 159 F.3d 147, 150 (3d Cir. 1998) (persons "were in close proximity to the crime scene a few minutes after the call of 'shots fired' was received," and these points were relevant when evaluating reasonableness of officer's suspicions); *United States v. Raino*, 980 F.2d 1148, 1150 (8th Cir. 1992) (*Terry* stop justified where "the officers were responding to a late-night call that shots had been fired in precisely the area appellant's car was parked").

Second, Torres testified that when Benitez approached the agents, he was "agitated," "yelling," and waving his arms in the air. Benitez's initial demeanor may be factored into the reasonable suspicion calculus. *See Mouscardy*, 722 F.3d at 76 (court considered that person was "agitated and nervous"). And while in hindsight Benitez's demeanor is arguably more understandable in light of the fact that his brother was indeed the person who had been shot, the agents were uncertain of that fact at the time because Benitez was an unidentified individual unknown to the agents. This is significant because the reasonable suspicion standard requires the court to evaluate "what the officer kn[ew] (or ha[d] reason to believe)" at the time. *See Romain*, 393 F.3d at 71.

Third, when Torres asked Benitez to produce an identification so that he could confirm that Benitez was the victim's brother, Benitez refused to do so, turned around, and walked away. That Benitez declined to produce an identification is a relevant factor because it may indicate to a reasonable officer that a person would refuse to do so "possibly to conceal his identity." *See Mouscardy*, 722 F.3d at 76 (citing *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (passenger's failure to provide identification, "possibly to conceal his identity," was factor that could be considered in determining whether pat-down

during *Terry* stop was appropriate)). And even if Benitez was not carrying an identification, as defense counsel seemed to suggest at the hearing, Benitez's evasive response to the agents' requests—refusing to talk to the agents and walking away—is itself relevant under *Terry*. *See Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016) ("'evasive and deceptive responses' to an officer's questions about what an individual was up to" is relevant) (quoting *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010)).

To be sure, defense counsel pressed Torres to answer whether Benitez was required under the law to comply with the agents' demands that he produce an identification and that he not walk away from them. But these questions miss the mark in determining whether the agents met the reasonable suspicion standard, for "the *lawfulness* of the conduct that [the officer] observed does not dispel the reasonable suspicion that underpinned the stop." *See United States v. Pontoo*, 666 F.3d 20, 29 (1st Cir. 2011) (emphasis added). And even if it was lawful for Benitez to walk away without producing an identification—a legal question on which the court need not express a view in light of *Pontoo*—Benitez's refusal to identify himself added fuel to the agents' *suspicions* that he could have actually been one of the persons who perpetrated the serious, violent crime that had occurred not too long ago. *See United States v. Williams*, 775 F.2d 1295, 1300 (5th Cir. 1985) ("return to the scene of the crime . . . may indicate either a lack of consciousness of guilt *or an attempt to avert suspicion*") (emphasis added).

Fourth, Torres testified that, as a result of Benitez's behavior, he drew his ankle-holstered weapon as he began following Benitez. That Benitez's unusual behavior caused Torres to keep his weapon in a more accessible location than his ankle holster lends further support to the proposition that the agents believed Benitez was involved in the shooting and was armed and dangerous. *See United States v. Soares*, 521 F.3d 117, 120 (1st Cir. 2008) (when conducting *Terry* analysis for pat-down, court considered "the occupants' movements [which] caused Jenkins to approach the car with his hand on his gun while Reid had his in a 'low ready position.'"); *see also United States v. Trullo*, 809 F.2d 108, 113 (1st

Cir. 1987) ("draw[ing] a gun while approaching a suspect in this context is an act of caution") (internal quotation marks omitted).

Fifth, Torres observed Benitez make a "quick" movement and reach for his waistband before making the face-to-face exchange of an unknown object with Cabreras. Based on his training and experience, Torres credibly testified that the movement of the individuals' hands and the close proximity of the two individuals led him to believe that a firearm had been transferred from Benitez to Cabreras. Deference—but not "blind deference"—is due to the experienced perceptions of the officers. *Woodrum*, 202 F.3d at 7. And this is because the Fourth Amendment "makes due allowance for the need for police officers to draw upon their experience and arrive at inferences and deductions that 'might well elude an untrained person.'" *United States v. Arnott*, 758 F.3d 40, 44 (1st Cir. 2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Torres revealed various facts that lend support to his suspicions. He testified that Benitez appeared to pull the unknown object from a concealed location in his waistband. *See United States v. Flatter*, 456 F.3d 1154, 1158 (9th Cir. 2006) ("attempts to reach for an object that was not immediately visible . . . can give rise to a reasonable suspicion that a defendant is armed"). And the manner in which the unknown object was transferred, according to Torres's experience, also made him believe that a firearm was furtively exchanged. *See Cardona-Vicente*, 817 F.3d at 828 (court considered in *Terry* analysis that as the officer "was walking around the Jeep to check the registration sticker, he saw that [the defendant] was clutching a fanny pack in a manner that, based on his experience, was consistent with there being a gun inside"); *see also United States v. Sanchez*, 817 F.3d 38, 43 (1st Cir. 2016) (court affirmed denial of a motion to suppress and credited an officer's belief that, "based on his experience," the manner in which a suspect reached for his waistband "suggest[ed] that [the suspect] had a gun"); *Thomas*, 818 F.3d at 877 ("unnatural hand postures that suggest an effort to conceal a firearm" is a relevant factor under *Terry*).

Cabreras's counsel underscored at the hearing that much of the two individuals' behavior was innocuous, lawful conduct. But again, "the lawfulness of the conduct that [the officer] observed" is not the dispositive issue when determining whether an officer had reasonable suspicion to believe that criminal activity was afoot, or that the person was armed and dangerous. *See Pontoo*, 666 F.3d at 29. And because "the *Terry* standard has a practical, commonsense bent," a "combination of independently innocent behaviors and circumstances, both general and specific, can create reasonable suspicion in certain cases." *Woodrum*, 202 F.3d at 7. Cabreras's declaration also highlights that a cellphone rather than a firearm was exchanged between Benitez and Cabreras. Even assuming *arguendo* that this is true, it is not entirely at odds with Torres's testimony—as Torres acknowledged that he did not see the object transferred. And even if Torres did make a good-faith mistake about the object transferred, "reasonable suspicion, based on a plausible but mistaken view of the facts," withstands Fourth Amendment scrutiny. *United States v. Coplin*, 463 F.3d 96, 97 (1st Cir. 2006).

In sum, all of the above circumstances—when taken together—furnished the ATF agents with reasonable suspicion to believe that Benitez and Cabreras were involved in the shooting. And because Torres reasonably believed that Cabreras was involved in a serious crime of violence and had just received a firearm from Benitez, there was reasonable suspicion to believe that Cabreras was armed and presently dangerous. Thus, the court should find that there was no Fourth Amendment violation when Torres conducted the *Terry* stop and frisk that led to the immediate discovery of a firearm in Cabreras's waistband.

### III.     The Arrests

Benitez seeks to suppress his post-arrest statements, arguing that his arrest was unlawful. Under the Fourth Amendment, a "warrantless arrest must be based on probable cause." *United States v. Brown*, 500 F.3d 48, 56 (1st Cir. 2007). If an arrest lacked probable cause, "evidence obtained as a result of the arrest is normally inadmissible against the

arrestee." *Id.* "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 324 (1st Cir. 2015) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). This standard is met "if, at the moment of the arrest, the facts and circumstances within the relevant actors' knowledge and of which they had reasonably reliable information were adequate to warrant a prudent person in believing that the object of his suspicions had perpetrated or was poised to perpetrate an offense." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 254 (1st Cir. 1996). "Probable cause 'does not require the quantum of proof necessary to convict.'" *Pontoo*, 666 F.3d at 31 (quoting *United States v. Miller*, 589 F.2d 1117, 1128 (1st Cir. 1978)).

In considering whether the agents had probable cause to arrest, the court may consider the same circumstances that supported the *Terry* stop and frisk. *See, e.g.*, *Brown*, 500 F.3d at 56 (court considered the "reasonable suspicion sufficient to justify the roadside stop" when addressing the defendant's challenge to the lawfulness of his arrest). In *Pontoo*, for example, the First Circuit held that there was probable cause to arrest an individual where he was subjected to a valid *Terry* stop and frisk, the frisk led to the discovery of a concealed weapon, the individual did not claim to possess a permit for the weapon, and there was no evidence that any such permit had been issued. *See Pontoo*, 666 F.3d at 31. The *Pontoo* court noted that "suggesting that the officers, in the circumstances at hand, had not developed probable cause after finding a concealed weapon does violence to the sensible proposition that 'probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at 32 (quoting *United States v. Vongkaysone*, 434 F.3d 68, 73–74 (1st Cir. 2006) (alteration and internal quotation marks omitted)).

In this case, all the circumstances detailed above that supported the agents' reasonable suspicion to conduct the stop and frisk—in addition to the fact that the frisk led

to the discovery of a firearm—should lead this court to find that the agents had probable cause to arrest Cabreras and Benitez. Because Torres had reasonable suspicion to believe that Benitez was potentially involved in the shooting and had covertly given an object believed to be a firearm to Cabreras, the discovery of the firearm on Cabreras's person confirmed at least part of Torres's suspicions and provided probable cause to believe that the two individuals were either involved in the shooting or, at the very least, had aided each other in efforts to conceal a firearm they unlawfully possessed. Indeed, defendants do not suggest—and no evidence was presented at the hearing to show—that Cabreras or Benitez could lawfully possess the concealed firearm. *See Pontoo*, 666 F.3d at 31.

Because the ATF agents at the very least had probable cause to believe that the two individuals aided each other to conceal an unlawfully possessed firearm, both Cabreras and Benitez were lawfully arrested. *See Pontoo*, 666 F.3d at 31 (where "no more than seconds passed between the stop and the discovery of the gun," the "reasonable suspicion to stop the appellant for a possible murder had morphed into probable cause to arrest him for possession of a concealed weapon"); *United States v. Green*, 670 F.2d 1148, 1153 (D.C. Cir. 1981) (probable cause to arrest where experienced officer "noticed that the parties to the transaction attempted to conceal the exchanged object" and the officer's experience led him to believe the object was contraband); *see also* Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment*, § 3.6(d) (5th ed.) ("if the police see a person in possession of a highly suspicious object or some object that is not identifiable but which because of other circumstances is reasonably suspected to be contraband, and then observe that person make an apparent attempt to conceal the object from police view, probable cause is then present"). As the arrests of Benitez and Cabreras did not violate the Fourth Amendment, the court should not suppress any post-arrest statements. In sum, the court should deny the motions to suppress the firearm, ammunition, and post-arrest statements.

## CONCLUSION

For the foregoing reasons, the motions to suppress should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 3rd day of October 2016.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge